```
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK



----------------------------X
                            :
IN RE: APPLICATION OF CITY  :
OF ALMATY FOR ORDER TO TAKE :   16-MC-623 (WFK)(JO)
DISCOVERY PURSUANT TO       :
28 U.S.C 1782               :   January 13, 2017
                            :
                            :   Brooklyn, New York
                            :
                            :
                            :
                            :
----------------------------X


            TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
               BEFORE THE HONORABLE JAMES ORENSTEIN
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:          ROBERT MALIONEK, ESQ.




For the Defendant:          JOHN KENNEY, ESQ.
                            JOHN CURLEY, ESQ.

Audio Operator:


Court Transcriber:          ARIA SERVICES, INC.
                            c/o Elizabeth Barron
                            102 Sparrow Ridge Road
                            Carmel, NY 10512
                            (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1              THE CLERK:  Civil cause for status

2    conference, docket number 16-MC-623, In Re:

3    Application of the City of Almaty.

4              Will the parties please state your

5    appearances for the record?

6              MR. MALIONEK:  Robert Malionek or Latham &

7    Watkins for the City of Almaty.

8              THE COURT:  Good morning.

9              MR. MALIONEK:  Good morning.

10             MR. KENNEY:  John Kenney and John Curley

11   with Hoguet Newman Regal & Kenney for the RMP

12   partnerships.

13             THE COURT:  Good morning.  Before we get to

14   the issue of fees, I just want to confirm that the

15   discovery that was ordered has been provided.

16             MR. MALIONEK:  The discovery that was

17   ordered was for our 1782 application to go forward.

18   Documents have been produced.  We do intend to serve a

19   notice of deposition.  That was part of the original

20   application that was granted.

21             THE COURT:  Right.

22             MR. MALIONEK:  So we'll be asking for the

23   PMK depositions, we assume, of Elvira Krapanoff (ph)

24   and others but we'll be serving that soon.  We're just

25   in the process of reviewing the documents first.  Thank

```
 1   you.
 2              THE COURT:  All right.  I take it there's no
 3   dispute about the deposition going forward?
 4              MR. KENNEY:  Not at the moment.  We don't
 5   expect one.
 6              THE COURT:  Very good.  If anything comes up
 7   in that regard, of course you'll let me know.  Let's
 8   get to the issue of fees.
 9              Mr. Malionek, I've read the papers and I may
10   have some questions but if you want to add anything to
11   your submission, I'll hear you.
12              MR. MALIONEK:  I think, your Honor, I'll try
13   to be brief then.  As you know, and we've never
14   actually had the opportunity to brief the background of
15   the case, but the City of Almaty is an interested party
16   pursuant to the criminal proceedings against the
17   Krapanoff family.  Victor Krapanoff was the mayor of
18   Almaty and his family have been accused -- warrants
19   have been issued for the arrest of members of his
20   family.  They were running a criminal enterprise and
21   had stolen and then laundered perhaps 300 million
22   dollars of funds through real estate, through U.S.
23   banks.  The 1782 application that we filed was our
24   effort on behalf of the city to try to locate the funds
25   that were laundered, we understand, through the RPM
```

1   entities that are the defendants in this action.

2           We filed the application in March.  It was

3   granted right away.  Then the motion to vacate had been

4   filed.  It was briefed and submitted in June and then

5   in October, as you know, your Honor, a hearing was --

6   the parties were asked for dates to appear for a

7   hearing on the 1782 application.  We understood at that

8   point that RPM's prior counsel was going to seek to

9   withdraw and then Mr. Kenney was planning to substitute

10  in.  We understand that RPM, from the motion to

11  withdraw, was not paying over $100,000 in RPM's fees.

12          At the status conference on November 17th --

13  that was three weeks later -- we prepared our

14  presentation with respect to all issues in the case,

15  including as necessary on the motion to vacate with

16  respect to the 1782.  Your order was for a principal or

17  officer of each of the RPM entities to attend.  Of

18  course, we prepared and they failed to appear.  You

19  issued a status conference for the next day with the

20  same instructions.  Again, we prepared and they failed

21  to appear.

22          At that point, Mr. Kenney substituted in and

23  they withdrew their motion to vacate without giving us

24  prior notice other than the evening before that

25  November 18th status conference.  You recognized, your

1    Honor, that we were free to seek sanctions with respect

2    to the costs incurred in the -- as caused by the

3    failure of the principals or officers to appear as well

4    as with respect to the litigation burdens in opposing

5    what ultimately became an abandoned motion.

6         The standard under Rule 16(f) states that

7    the Court must order a disobeying party, a party who

8    fails to appear, to pay the reasonable costs including

9    attorneys' fees.  The burden is on the disobeying party

10   to show that a sanction would be unjust or the conduct

11   was substantially justified.  We think that the

12   defendants can't meet their burden here.

13        With respect to the conferences, the

14   defendants' principals or officers failed to attend two

15   consecutive status conferences, forcing the City of

16   Almaty to incur costs related to the prep and travel,

17   without any substantial justification.  Defendants

18   argue in their response papers that they understood the

19   principals were not required to attend, but the Court's

20   orders were unambiguous with respect to that.  We think

21   they could not have been more clear.

22        The letter that was submitted by Elvira

23   Krapanoff, who is the principal for RPM-Maro,

24   acknowledged knowing about the orders and even that

25   their prior counsel had instructed her three weeks

before the hearing that failing to appear wouldn't be

acceptable, in all likelihood.  No explanation has ever

been provided by RPM U.S.A. for their failure to appear

and under the rule, the sanctions include all expenses

incurred because of the noncompliance, so everything

flowing from the sanctionable conduct.  Here, they're

abandoning their motion without prior notice, forcing

us to prepare, as well as their failure to appear at

the status conferences.

As to the briefing, the defendants wasted

the Court's time, the City of Almaty's time in

litigating and preparing for a motion to vacate,

including at those November status conferences that was

ultimately simply abandoned.  Their only explanation

for doing this is that there was a ruling that came out

in June in an unrelated case that the City of Almaty is

not involved in.  And after that ruling came out on a

joinder issue, it no longer made sense, they say, to

resist the subpoenas.  That was in June.

They failed to explain why they neglected to

tell the Court or the City of Almaty for five months

that they were then planning on withdrawing their

motion to vacate.  They didn't say that they were

planning to do so when the Court asked the parties to

schedule a hearing.  They didn't say they were planning

1    to do so when the Court scheduled the November status

2    conferences.  They didn't even say anything at the

3    November 17th hearing, which forced the City of Almaty

4    to incur additional costs related to the preparation.

5    We think that for all of those reasons, they don't meet

6    their burden of showing that an award under these

7    circumstances would be unjust.

8           The second issue that the defendants take up

9    in their papers is that the City of Almaty's fees and

10   costs are unreasonable here.  The fees and costs that

11   we seek are less than $100,000, $89,000 in fact.  The

12   standard of the Second Circuit is, what would a

13   reasonable client be willing to pay to prosecute this

14   particular case?  Here, there's no better evidence, we

15   think, than what the defendants' own counsel's fees

16   have been for just a portion of what the city is

17   seeking in this case.

18          Prior counsel stated in their motion to

19   withdraw that it was owed over $100,000.  That did not

20   include the amount that they had already subtracted

21   because of the retainer.  It did not include the

22   preparation and the attendance at the status

23   conferences.  It did not include any costs related to

24   preparing this motion, this application seeking our

25   costs.

1          It's also clear under the Second Circuit's

2     precedent that a Rule 16 sanction and the sanctions

3     that are allowed under this Court's inherent authority

4     also can be used as penalties or as a deterrent.  Under

5     the Mahoney case, for example, the Court can take into

6     account the financial situation of the disobeying

7     parties and found that it's reasonable and particular

8     to take into account the amount that they themselves

9     spent for their own counsel's defense in a case.

10          Here, keep in mind please that the

11     defendants are accused of participating in money

12     laundering of hundreds of millions of dollars of the

13     city's funds.  We have started to see evidence of the

14     documents that we've started to review.

15          THE COURT:  One moment.  Go ahead.

16          MR. MALIONEK:  The cases that the defendants

17     cite we think are all with respect to inapposite

18     circumstances.  They cite cases, for example, where

19     sanction awards were reduced or attorneys' fees were

20     reduced because the party seeking the sanctions made no

21     effort to provide what the professional qualifications

22     were of the attorneys that were involved.  They cite to

23     cases with respect to block billing, in which the court

24     was unable to determine what amounts within a block

25     bill were related to the sanctionable conduct, whereas

1    here, we've already deducted and redacted out anything

2    that is unrelated to just those fees for which we seek

3    the sanctions.

4              Here, we also already deducted some of the

5    City of Almaty's costs, including -- we've deducted Mr.

6    Schindler's return trip back to L.A. by half.  We

7    haven't asked for any sanctions related to the

8    preparation time for the November conferences that were

9    incurred by the associates who are involved in the

10   case.  We've excluded any of the fees related to

11   preparation for this hearing.  So think for all of

12   those reasons, a sanction is appropriate and the fees

13   that the city are seeking and costs are reasonable.

14   Thank you.

15             MR. KENNEY:  Thank you, your Honor.  I'll

16   try to be brief.  I realize that you've read the

17   papers.  I do have to mention a couple of things in

18   light of the argument that was just made.  Let me start

19   with RPM's partnerships.

20             I'm not sure that the Court is aware that

21   these are both limited partnerships and they're

22   designed -- and it's a fairly commonly design for banks

23   and investment individuals and partnerships investing

24   in other countries from the U.S. to another country,

25   another country to her, and that's what these are.

1   They were designed to receive money from abroad and to

2   invest in certain entities.  The Moro one was for the

3   benefit of the daughter of the Krapanoff family, who

4   you've heard about and lives in California, has a

5   family there and a small business and three children.

6   None of these entitles have any staff or have done any

7   activity in the last -- I think since 2014.  So that's

8   the status.

9           As to Kazakhstan, what's being left out is

10  that Kazakhstan is run by a dictator who runs all three

11  branches of government.  Our client and other members

12  of his family are political dissidents.  The father,

13  Victor Krapanoff, has requested political asylum in

14  Switzerland.  The Kazakhstan government, through Almaty

15  and other entities, have brought lawsuits against this

16  family in Los Angeles, in the Southern District of New

17  York, with a RICO which was -- the RICO parts were just

18  dismissed.  The Los Angeles case was dismissed and is

19  on appeal.

20          The Latham firm is handling the Los Angeles

21  case.  The Boyz (ph) firm is handling the case here.

22  That dismissal is -- they're requesting a certification

23  to appeal.  Cases have been brought in Great Britain,

24  Switzerland.  There are criminal investigations that

25  have been started in various places.  So what we have

1    is a political battle.  The case in the Southern

2    District was dismissed because the RICO counts --

3             THE COURT:  I'm sorry to interrupt, sir, but

4    there's no political battle in this Court.  It's simply

5    a matter of -- it's a very narrow issue and I have no

6    intention of weighing in on who's right or wrong as

7    between the various litigants on any of the merits

8    here.  It's just a matter of --

9             MR. KENNEY:  I was just responding --

10            THE COURT:  Yes, and I'm not taking into

11   account anything about the backdrop, particularly the

12   political backdrop.

13            MR. KENNEY:  So far --

14            THE COURT:  You can address the motion

15   that's before me, though.

16            MR. KENNEY:  So far as I know, your Honor,

17   only partly in the motion that (ui) responded to has

18   there been any response to that, and I just didn't want

19   to leave that on the record without any response.

20            THE COURT:  I'll tell you what.  Anything

21   that you want to say about the political aspects of

22   this, feel free to expand the record by submitting your

23   political views --

24            MR. KENNEY:  Sure.

25            THE COURT:  -- on behalf of your client in a

1  separate mailing, okay?  But let's address the motion

2  here.

3        MR. KENNEY:  I will do that, your Honor.  So

4  let me address Elvira Krapanoff.  She uses her married

5  name, as you know from the letter that you received,

6  but we'll call her Krapanoff because it will show the

7  connection more easily.

8        The proceeding here is a request for

9  interrogatories which was ex parte and granted, as your

10 Honor knows.  The hearing that we're talking about was

11 not, as we understood it, a hearing for oral argument.

12 It was a status conference and it was ordered by the

13 Court on the same day, October 27th, that the Morville

14 firm indicated it wished to withdraw.  We appeared on

15 the 17th, frankly as a courtesy to the Court and to let

16 you know we would represent them but we hadn't been

17 retained at that time, so we filed our notice of

18 appearance the following day, on the 18th.

19       The Court may impose sanctions for failure

20 to appear provided there's not a reason why -- the

21 Court isn't required to impose sanctions.  We will

22 argue in a minute that the only sanctions or fees that

23 should be imposed are for the second day of the

24 hearing.  I'm going to put that aside just for a

25 minute.

1              In terms of Elvira Krapanoff's conduct, she

2    did know that you had issued an order on the 27th that

3    she was to appear.  The circumstances are -- I think

4    this is important for the Court to take into

5    consideration.  Her counsel that had been representing

6    her had filed a request to withdraw.  Her new counsel,

7    which she -- we had spoken with her and she knew we

8    were available but had not yet been retained and had

9    not yet filed a notice of appearance.  In effect, she

10   didn't have any counsel.  She did have counsel --

11              THE COURT:  I'm sorry, I cannot agree with

12   that and I'm sure you know that that's not true.  She

13   had --

14              MR. KENNEY:  Well --

15              THE COURT:  Excuse me, sir.

16              MR. KENNEY:  Yeah.

17              THE COURT:  She had counsel of record who

18   was seeking to withdraw.

19              MR. KENNEY:  Yes.

20              THE COURT:  As I did then and as I always do

21   in such circumstances, I required counsel and client

22   together to appear so that I can discuss the motion

23   with them.  She was not without counsel.

24              MR. KENNEY:  The point that I'm making is

25   not that she's not without counsel.  She had at least

1   some inability to get the legal advice that she needed,

2   and she went to another lawyer who represented her in

3   the Los Angeles case --

4              THE COURT:  Look, of all the aspects of the

5   motion before me --

6              MR. KENNEY:  Yes.

7              THE COURT:  -- the idea that your client had

8   an excuse for not appearing as directed at that first

9   conference is I think the least likely to persuade me.

10  So I encourage you to move on to other aspects but I

11  will of course hear you out.

12             MR. KENNEY:  Well, I'll be brief.  The point

13  that I want to make is, she did go to counsel in Los

14  Angeles.  The counsel in Los Angeles did send an email

15  to Morville's firm seeking to have her appear by

16  telephone.  She says that in the letter of the 17th and

17  that should go to some weight at least, not as an

18  excuse -- she says in here letter, I apologize but I

19  didn't intend to do this.  I thought because lawyers

20  were going to appear, that there was no issue and I

21  would not have to appear.

22             THE COURT:  But I can't imagine that any

23  lawyer, yourself or anyone else, would have told a

24  client or potential client, you can assume you don't

25  need to follow this order, even without hearing from

1    the Court.  Every responsible lawyer in that

2    circumstance would say, look, I'm going to do my best

3    to get you out of this but you've got an order and

4    until we get an order vacated, you need to comply.

5    That would have been your advice, certainly.

6            MR. KENNEY:  I don't disagree with you but I

7    am a lawyer.  I know what my advice would be.

8            THE COURT:  Right.  Look, either she was

9    getting advice from lawyers or she wasn't.  If she

10   wasn't, she just had an order and she had to comply.

11   If she was, I know what the advice must have been or

12   should have been.  But in any event, she had an

13   obligation.  I do request, most respectfully, that you

14   move on to something else because --

15           MR. KENNEY:  I'm happy to.

16           THE COURT:  At best, we're going to disagree

17   on this one.

18           MR. KENNEY:  Yes.  So I've made my point.

19           THE COURT:  Yes.

20           MR. KENNEY:  And I fully understand your

21   Honor, so we'll turn to costs.  The order that your

22   Honor issued was to have a status conference.  The

23   order was not to have oral argument on an outstanding

24   motion.  We understood when we read the papers

25   afterwards that your Honor wanted to have counsel and

1   wanted to make sure that if you granted the motion to

2   withdrawn, that there would be other counsel and the

3   case would move forward.  That's why we showed up in

4   the courtroom.

5           The only expense that the Latham firm went

6   to was to come back the second day, which we agree and

7   we've told them, we'd be happy to see your costs on

8   that and pay for that.  We don't think we should be

9   paying for and we don't think there's any connection

10  between the failure to appear and the briefing of that

11  motion.  The motion had been presumably mostly briefed

12  prior to the time -- the motion was fully briefed on

13  the 2nd of June and we don't understand why somebody

14  would go to great lengths to get the motion ready when

15  they were appearing for a status conference and it

16  wasn't clear who the counsel was going to be on the

17  other side.  That's why we don't think that our client

18  should be -- that those costs should be imposed on it.

19          What they have is, they want $90,000,

20  essentially, a few dollars less than that.  That's

21  $56,000.  $20,000 also is in preparation for that

22  motion, which wasn't scheduled for oral argument so far

23  as we know.  Certainly, we looked at the order to see

24  if we had substituted, if we'd have to be ready to

25  argue the motion.

1          THE COURT:  None of it would have been

2    required -- there wouldn't have been a penny of these

3    costs that are at issue now if your client hadn't made

4    the motion to vacate, right?

5          MR. KENNEY:  Sure.

6          THE COURT:  Okay.  And I take it as a legal

7    proposition, you agree that if that motion was made for

8    purposes of delay and harassment, the fees can be

9    awarded, correct?

10          MR. KENNEY:  Yes, if there was a basis to

11    make such a finding.

12          THE COURT:  Okay, so that's really the

13    issue.  You're saying that the motion to vacate was

14    made in good faith and that as of mid-June -- I forget

15    the exact date --

16          MR. KENNEY:  Right.

17          THE COURT:  -- based on Judge Nathan's order

18    in a case, in which none of the parties here is a

19    party, is that correct?

20          MR. KENNEY:  No.  Almaty is the plaintiff.

21          THE COURT:  In the Judge Nathan case.

22          MR. KENNEY:  In the Judge Nathan case.

23          THE COURT:  Okay.

24          MR. KENNEY:  And Victor and Ilius (ph)

25    Krapanoff are defendants, the father and brother.

```
1                    THE COURT:  Okay.

2                    MR. KENNEY:  But not (ui).

3                    THE COURT:  You're saying as a result of the

4     ruling in that case, your clients, who are not parties

5     there, decided that they would no longer resist

6     discovery in this case.

7                    MR. KENNEY:  No.

8                    THE COURT:  No, okay.  I misunderstood your

9     position then.

10                   MR. KENNEY:  What we're saying is, in part,

11    that's true.

12                   THE COURT:  So it is true.

13                   MR. KENNEY:  No.  That's a piece of the

14    judgment.  That's a piece of the judgment.

15                   THE COURT:  But that piece of it is correct,

16    that they were resisting before.

17                   MR. KENNEY:  Yes.

18                   THE COURT:  In good faith.

19                   MR. KENNEY:  Yes.

20                   THE COURT:  And that as a result of Judge

21    Nathan's decision, they decided not to resist.

22                   MR. KENNEY:  As a result of Judge Nathan's

23    decision joining them in that case --

24                   THE COURT:  Yes.

25                   MR. KENNEY:  -- they decided that since that
```

1    allowed third party subpoenas, for which there wouldn't

2    be the same basis to oppose as the motion to vacate, we

3    should consider that among other things as to whether

4    we wanted to go ahead with the motion to vacate.

5                THE COURT:  When was the decision made to no

6    longer resist?

7                MR. KENNEY:  The decision to no longer

8    resist was discussed at great length --

9                THE COURT:  When was it made, sir?

10               MR. KENNEY:  It was made on the 17th or 18th.

11               THE COURT:  Of?

12               MR. KENNEY:  Of November.  I'd like to --

13               THE COURT:  I'm going to ask you to pause

14   for a moment.

15               MR. KENNEY:  Sure.

16               THE COURT:  I want to take a look at your

17   document.

18               (Pause in proceedings.)

19               THE COURT:  Page 2 of your letter of

20   December 29th, at the end of the third paragraph under

21   section heading number 2.

22               MR. KENNEY:  Yes.

23               THE COURT:  "After the RPM entities moved to

24   quash here, Judge Nathan granted a joinder motion on

25   June 21st, 2016 that expended the scope of the Southern

1   District action and made third party discovery toward

2   the RPM entities more likely."

3              MR. KENNEY:  Yes.

4              THE COURT:  "At that point, it no longer

5   made sense to resist the subpoenas."

6              MR. KENNEY:  Yes.

7              THE COURT:  But you're saying, having

8   determined that at that point, it no longer made sense

9   to resist, the decision to actually stop resisting was

10  not made until November.

11             MR. KENNEY:  Yes.  Well, let me make clear

12  we didn't --

13             THE COURT:  So your client persisted --

14             MR. KENNEY:  Wait just a second.

15             THE COURT:  -- in pressing a motion that no

16  longer made sense for them for those five months?

17             MR. KENNEY:  Well, there are a number of

18  pieces missing there.  We didn't represent this client

19  until November 18th, so we talked to them and we and

20  then made the decision.  We knew about --

21             THE COURT:  I'm sorry, Mr. Kenney, but this

22  is somewhat frustrating because it seems to be moving

23  the goalpost in terms of what your client is asserting

24  as just not a reason but as to what happened.

25             MR. KENNEY:  Let me --

```
 1              THE COURT:  And I can't resolve, I don't
 2   think, these factual issues at this point about who
 3   made the decision and when and on what basis without
 4   factually getting evidence from the clients and the
 5   attorneys who advised.  I don't want to intrude on the
 6   privilege but if you're saying that it no longer made
 7   sense to resist as of June 21st but the decision to stop
 8   resisting wasn't made until November 17th, I have a lot
 9   of questions that need to be answered and among them
10   are facts -- the absence of any indication that they
11   would no longer resist discovery, the fact that they
12   didn't provide the discovery in the intervening months,
13   statements in the motion to withdraw that are wholly
14   inconsistent with a belief that resisting the subpoena
15   no longer made sense.  Frankly, I have some real
16   reservations about the veracity of the assertion.
17              MR. KENNEY:  Let me make a proffer if I may.
18              THE COURT:  And I need to resolve those
19   before I can give some credit to the position you're
20   taking.
21              MR. KENNEY:  May I make a proffer?
22              THE COURT:  You've already done so but go
23   ahead, make some more proffers.
24              MR. KENNEY:  I'm arguing but now I'm saying
25   if you have a hearing, this is what you'll find out.
```

1          THE COURT:  Yeah.

2          MR. KENNEY:  We did not get in this case and

3   make decisions with the client until the 17th and 18th

4   of November.  We are the law firm that made the

5   decision not to go forward with the motion.  There were

6   a number of reasons that I can tell you because I was

7   there and I had the phone calls, but I didn't have any

8   authority and I didn't represent this client in this

9   case between June and November, so I wasn't

10  participating at that time and I don't know what they

11  thought.

12          I'm telling you what I thought, and what I

13  thought was, you have this other case where they can

14  get the same stuff now.  They haven't yet, maybe they

15  wouldn't.  It's costing $100,000.  We're the second

16  firm to come into this case.  Obviously, we don't want

17  to continue along this range.  Any decision made by the

18  Court in this case was almost certainly going to be

19  appealed no matter how it came out.

20          We looked at the documents or waked through

21  the thing.  We decided it was more practical to

22  withdraw the motion and produce the documents and have

23  the deposition than it was to go forward.  We had this

24  discussion with our client.  The client agreed and

25  that's why we suggested withdrawing the motion.  We

1    asked the Latham firm if they would consent.  They

2    refused to consent so we came in and asked the Court if

3    we could make a motion to withdraw.  It had nothing to

4    do with what sanctions the Court might impose.

5             THE COURT:  Why didn't I hear about that in

6    the first communication from your client saying, sorry,

7    I can't be there?

8             MR. KENNEY:  I don't recall but I think the

9    answer to that is, we hadn't fully made that decision.

10            THE COURT:  But you're telling me that

11   that's the date the decision was made.

12            MR. KENNEY:  Either the 17th or 18th.

13            THE COURT:  I see.  It's disturbingly

14   malleable, Mr. Kenney.

15            MR. KENNEY:  We were discussing it, Judge.

16            THE COURT:  I see.

17            MR. KENNEY:  And then when we came in on the

18   18th, we had decided that --

19            THE COURT:  And no hint of that in the

20   letter of November 17th from your client.

21            MR. KENNEY:  I wouldn't expect there would

22   be.

23            THE COURT:  No.  All right, well --

24            MR. KENNEY:  I don't think she's going to be

25   saying, we're thinking about withdrawing the motion.

1    She's our client.

2              THE COURT:  As far as you know -- do you

3    know one way or the other if your client had any such

4    discussions with prior counsel?

5              MR. KENNEY:  I don't know.

6              THE COURT:  This is frankly, Mr. Kenney,

7    very troubling.

8              MR. KENNEY:  I'm more than happy to answer

9    any questions the judge might have in mind to put you

10   at ease, if I can.

11             THE COURT:  My questions are about when this

12   decision was purportedly made.

13             MR. KENNEY:  Right.

14             THE COURT:  Because the way it looks to me

15   right now, the only thing that seems to be consistent

16   with the objective facts on the record in terms of what

17   was said by whom and when is that the statement that we

18   decided only on November 17th to withdraw the motion is

19   less plausible than the proposition that the motion to

20   vacate was made for purposes of delay and harassment,

21   because had the motion been deemed unwise or futile in

22   June, I would expect for any number of reasons the

23   docket to look very different than it does.  The

24   questions I would want to ask are questions that need

25   to be posed to your client, to former counsel, to

1   yourself under oath.  We can have that here and if

2   necessary to resolve this issue, we will.

3            MR. KENNEY:  All I can tell your Honor is, I

4   was not representing the client before the 17th of

5   November, so I don't know what they were thinking or

6   their lawyers were thinking.  I wasn't a participant in

7   that.

8            THE COURT:  Of course you weren't a

9   participant.  Well, not of course.  I'll take your word

10  for it that you weren't a participant.

11           MR. KENNEY:  We knew this was going on.

12           THE COURT:  These questions I think would be

13  apparent to anyone looking at this record.  And the

14  fact that you didn't represent your client before

15  November 17th doesn't mean you're unable to ask her

16  about what happened before November 17th.  But

17  apparently you have not done so and maybe there's some

18  reason not to have done so.  But in any event, if this

19  continues to be a controversy that I have to resolve,

20  there are questions I need to have answered because the

21  most readily apparent and most plausible explanation is

22  one that suggests a different motive for the motion

23  than you proffered to the motion to vacate and one that

24  would, as you conceded, justify an award of fees for

25  litigating the motion and all of the succeeding

1   appearances.

2          That said, I do have some concerns on the

3   other side about the amount of fees.  We're in the

4   Eastern District, not the Southern District, and

5   whatever the wisdom of the Second Circuit's decision in

6   Simmons saying that you have to look at Eastern

7   District fees in such circumstances, that is the law of

8   the circuit.  So I'm not prepared to sign off on the

9   very high fees that I know you can demand in the

10  Southern District.  I don't doubt the veracity of that.

11         I'm wondering if it would make sense to take

12  a break while you folks discuss two things, only one of

13  which necessarily would be pertinent.  One is whether

14  you can agree on a compromise that resolves this

15  entirely, the amount to be awarded.  Secondly, if you

16  can't, to come up with dates for a factual hearing to

17  resolve the questions that -- the factual questions

18  that I've discussed.  Do you want to take a break to do

19  that now or do you want to confer with each other and

20  write back to me in a week or so?  What do you guys

21  think?

22         MR. MALIONEK:  I would be happy to have

23  those discussions over the phone and get right back to

24  your Honor.  I think that might be the most efficient.

25         THE COURT:  Okay.

1          MR. MALIONEK:  But we of course will follow

2    your lead.

3          Mr. Kenney, I'm sorry if you have a

4    different thought.

5          MR. KENNEY:  I'd be more than happy to talk

6    about it right now and get back to you in a few

7    minutes, if your Honor has the time.

8          THE COURT:  Why don't we take a break and

9    see if you can resolve something quickly.  If not, I

10   don't want to put time pressure on it.  I want to have

11   considered decisions, so don't feel any pressure from

12   my end to do it that way.  If you both feel that you

13   can, by all means, I'll certainly wait a few minutes.

14         MR. MALIONEK:  Your Honor, I apologize.

15   While we're happy to talk about it right now, it will

16   take some time to be able to then discuss it with our

17   client.  I do actually respectfully think it may make

18   sense to get back to the Court a week from now.  I

19   don't want to preclude us discussing it right now.  We

20   absolutely will.

21         THE COURT:  Right.  You're saying you can't

22   reach an agreement because you need to run it your

23   client.

24         MR. MALIONEK:  Right.

25         THE COURT:  That's understandable.  I'd

1    understand that on either side.  So why don't I expect

2    a letter from you a week from today, and either you'll

3    tell me it's resolved or what other possibility there

4    is short of resolution before we go ahead and schedule

5    a hearing.  If you guys think you haven't resolved it

6    but it's not out of reach, im happy to have -- I

7    wouldn't want to be personally involved in trying to

8    sponsor settlement negotiations on it because in the

9    absence of an agreement, I'd have to come up with a

10   number myself.  But I could refer you to court-

11   sponsored mediation or another magistrate if that's

12   something you all agree on.

13          So let me know your preference and we'll

14   take it from there.

15          MR. MALIONEK:  Thank you, your Honor.

16          THE COURT:  Thank you all.  Have a very good

17   day.

18                  * * * * * * * * *

19

20

21

22

23

24

25

```
1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                    January 19, 2017
```